All right, next case is Carter v. Carter for the appellate Bruce Smith and for the appellate Mr. Stewart, you may proceed. Thank you, Your Honor. Please, the court and counsel. This case has been here before and it was sent back for the trial court to make some determination with regard to the activities of the trustee. As I understand the law, the trustee has a responsibility to maintain accurate records, be able to tell what came into the trust, what came out of the trust, and what he did with the trust property. Failure to abide by those principles and all presumptions should be made against the trustee. The real issue in this case, can anyone tell from what the trustee presented to the court what he did during a period of 28 years? Further, even after the court's order that was entered in this case, he still continued to operate his business the same as he did before. He commingled everything he did, so it makes it difficult for anyone to separate what he put in and what he took out and what's appropriate for the trust and one of his other business activities. If the court cannot tell what came into the trust and what he did with that property, then the presumption is that everything that he reported as income should be attributable to the trust. He had the opportunity to separate those, he didn't. He chose to operate his business solely on a cash basis with absolutely no supporting documentation for the records. Even his accountant. The accountant took what the defendant gave him and just put it into a nice spreadsheet. But that accountant never verified anything, never checked any of the records, never looked at any supporting documents. The beneficiary shouldn't have to prove what he did, but that's the job of the trustee. I think what the beneficiaries did was prove what he did not do, and that is keep accurate records. I believe that the order of the trial court is not based upon the facts in the case. There are several occasions where the court makes the observation that my clients are not credible. It never says why. In fact, Jennifer Bernal did not even testify in the second one. It all comes from the first, and this court already reversed what that decision was. It's difficult to argue to this court why A is not credible and B is credible unless the court tells us there's a basis for that. There's no doubt that the trial court did not like the way my client acted in the trial. I think that he acted immaturely. That's not a reason to say that anything he says is not credible. A number of times, even in the first argument in this case, he mentioned that the defendant was an unsophisticated person. Well, I'm not exactly sure what the true definition of sophisticated is, but I do know this, that this trust was created, as he said from the beginning, to protect his business for the benefit of his children. He was sophisticated enough to know that if you have just cash, you can't trace everything in and out of business. If you don't have records to support what you said, then what I say is the only basis you have. And he was, I think, sophisticated enough to hire a very capable counsel to represent him in this case. I don't think that Mr. Carter was credible. He makes the claim about this money that he took from his father. When you look at that, that debt was listed in his mother's estate, and the return for the federal government says it is deemed that this is uncollectible, which means he's never going to have to pay that back. To say that I invested all this money that I never really did, and never going to have to pay back, and use that as a basis to say that that should be taken into consideration of the court. The trial court took two appraisals that we had, their appraisal and our appraisal. And suddenly, without anything in the record prior to that, suddenly says that we have to appoint a discount to that because of minority interest. I don't mind arguing things in the court, but I don't like to argue things after the fact. I never had any opportunity to address with the court about minority interest. Their expert didn't bring it up. Our expert didn't bring it up. If that was going to be an issue, I would have liked to have had the opportunity to argue that with the court, but since it was done after the fact of the presentation of the evidence, I don't have any chance to address that. I just don't think that's fair. I believe that we have presented, or I should say that they presented. What they presented was just some numbers, never anything to support. So it is very, very difficult for anyone to attack or bring in other evidence to say that they're wrong if I don't know what the basis is. I don't have any supporting documents for Mr. Carter. It seems that the defense... Well, Mr. Smith, let me ask you this question. I understand that Mr. Carter didn't keep records, or to the extent he kept some records, they weren't very good, and it's basically throwing a dartboard to figure something out. What's the alternative? If Judge Zappa said, this is a mess, an absolutely intractable mess, can't be fixed, we've got to end this litigation, what else could he have done? Well, with regard to the evaluation, he could have used evaluations that were presented to him. I don't think there should have been any discounts on that. We did note in the trial court that there was some discrepancy upon the records he has and then what he reports on his income tax. Now, he says that he reported everything, but they don't match up with the receipts that he told us that he had. There's no doubt that he made some money. He was not there as a hobby with regard to this. He had trailers that he was making $23,400 off. He had a stable that he was making some $28,800 off, and that was on the trust property. And the trust document says that the trustee may deal with the trust at an arm's length basis, but any potential benefit from the transaction should adhere to the trust, not to the trustee individually. So there were numbers there that he could have used to say that I will take this number and say that you made that much money and you made that money off the trust. With the extension? Well, but don't you also have to factor in his personal efforts? I mean, it's not like you inherited an apartment building and you could just draw the rents off every month. I mean, they're running the stable, running the Halloween rides, and all that sort of thing. It's not passive income. Right. But the hay rides were run basically with volunteer help, that people weren't being paid other than giving them a sandwich and food. So you take a look at that, so a substantial amount of the income belonged to the trust or Mr. Carter. But even at that, I understand, Your Honor, that there's a difficulty with these numbers, but the court made no determination of that. The court didn't even try to pick a number and say this is fair and reasonable, that a third of the income, a fourth of the income that he had there should be attributable to the trust. Because obviously he made money off of that. Right. We cannot be precise on that. But at least there should have been something that the court could have found. The court could have made some, say, well, you made this much in that year, so we're going to extrapolate that over the time that you have. Because his income kept going up and up and up. And he had the opportunity to do that for us, to separate some of these things, and he chose not to. I realize that this court is presented with the same thing that Judge Zampa had with regard to that, we have a lot of numbers here, but how do I separate those things out? But Judge Zampa didn't even try to do that. He just said, you know, no, no, all you're going to get is a discounted value on the real estate and that's it. I don't think that's fair. Even if Judge Zampa said that, well, we're going to make $1,000 a year, that at least he recognized the fact that he did make money off the trust. I realize that we tried to do that, and we extrapolated some numbers in that. And we extrapolated some high numbers. I just don't know what the man brought into that, because when you deal with cash, you're relying on everything he says, and this is all we have. I realize it's difficult. It's all in his front pants pocket. It may be. If there's any other questions, I'll take them. Well, Mr. Smith, I'm trying to find in your brief where you refer to the discounting argument. Maybe I'm just not seeing it. Okay. All I point out is on page 24, when I refer to paragraphs 9 and 10 of the court's decision, the court received testimony of two appraisers, two qualified appraisers, take one or the other, and had before three written appraisals for this copy. Neither of the appraisers, nor the appraisal, addressed the issue of minority interest in the determined valuation,  and the court just simply decides, hey, we're going to take minority interest. As I said, if that was going to be an issue, I could present testimony with regard to whether you shouldn't apply to that. Most of the minority interest discount in valuation is used in the states for tax purposes, for federal tax purposes and the state tax. Quite frankly, I've never come across it being used in a situation like this, if you were doing a partition that you would sell somebody, you're only going to get 30 cents on the dollar because you only had half a cent. So there's no opinion testimony or anything in the record? No. To support a discount based on the minority? No. Thank you. You'll have additional time on rebuttal. Okay. Mr. Stewart. And let me explain, Justice Harris stepped out for a moment because his son is in Tel Aviv as we speak, and I want to program through him at MIT, and so he's kind of worried about getting him home. Yeah. If it please the court, our position is the trier of fact is the sole trier of fact, and the appellate court should defer to that assessment of the admissibility and quality of the evidence and the credibility of the witnesses, and only if the findings appear unreasonable, arbitrary, or not based on evidence should they set it aside. There are several different aspects. The first appellate court review came as a result of the trial court finding that two documents, actually three documents, a quit claim deed and an assignment signed by John Robert Carter and Jennifer Bernal terminated their interest or their remainder interest in the Spendthrift Trust. This court, dealing with that issue, said no, trial court, you're in error because we do not find that there was sufficient consideration underlying those quit claim deeds and assignments. That was what was before the appellate court. The appellate court then sent it back and said, okay, in light of the fact that those quit claims and assignments are not effective to transfer the remainder interest of these two plaintiffs, look at the enhanced value of the improvements placed there by the defendant, Ed Carter, determine the value of the trust assets, and then look at net income generated during the pendency of the trust. Three different issues. Counsel has not addressed the issue of, or vaguely has addressed, the enhanced value of the improvements. It's clear that Ed Carter moved onto the property, first into a mobile home, and then built a residence that took him four years to build. He was the laborer who built it. Funding for the materials came through a loan from Luke Carter, his father. Each of the invoices that Luke Carter paid on, on behalf of his son, the loans were issued to Ed Carter, and they had the address of the property. So Ed Carter performed all the labor. He arranged for the purchase of all the materials, and he secured a loan through his father, and his father even filed in Ed's divorce proceeding a compilation of all the billings that he had paid on behalf of his son. It was not ruled on whether or not that was a valid loan or a gift. On Luke Carter's death, his Form 706, United States Estate Tax Return, says not that it's uncollectible, but the collectability is unknown. There are two different arguments. And until Mildred Carter died just recently, within the last six months, there's been no determination, and there's no determination now as to the enforceability of that loan, which was shown on the 706. Is Ed Carter's share going to be reduced out of his father's trust proceeds? Are his siblings going to say, Ed, you received your inheritance in advance through loans. We're enforcing those loans. To say that it's uncollectable and never will be received, I don't think is accurate. That remains yet to be determined through the court process. But it's clear that Ed Carter performed all the labor building that house, and his family lived in the mobile home and then lived from about 1991, I believe, through 2001 in that family residence. And they're seeking rent for the entire period, including the period where one of the plaintiffs lived with his mother in that house, all the way through the divorce. So the enhanced value, we would say, is the complete value of that residence. Barry Taft put it at $205,000. In the divorce, he had placed it at $220,000. Greg Kinsler, our appraiser, placed it at a value of $270,000. Barry Taft placed a value on the enhanced or the improvements on the rest of the property, outside of the residence, at $60,000. All the testimony shows that all of those improvements on the rest of the property, other than the residence, were caused by Ed Carter. He built them or he removed a sawmill and placed it on the property. He built the boarding stables. He built the pole shed that was on the property. That $60,000 was an enhancement caused by Ed Carter and should be considered by the court. I argued and presented to the trial court that both appraisers roughly valued the ground around the residence at $3,000 an acre. One used a 4.48 acre tract. I think that was Barry Taft. And Greg Kinsler used a 5 acre. Roughly $14,000 to $15,000 of value on the underlying real estate. So if you take that off and you say there's $60,000 of enhancements out in the rest of the property and you take the $15,000 of real estate that was there originally with the residence, Ed Carter ought to get that residence no matter what. Whether the trial court or whether the appellate court reforms and directs it back, Ed Carter built the house and he's got enhancements and my argument is, an equitable method is, that he should get the house and at least 4.4 acres to go with that. That remains that you have $45,000 of enhanced value for the rest of the property. You've got Barry Taft who says all of this property outside the residence is worth $300,000 and $60,000 is contributory value of the improvements, the enhancements. So $240,000 bare ground without those enhancements. Greg Kinsler put it at $211,000. The court looked at it and said apparently $211,000 is what I'm going... I thought they said $220,000. I thought you said $220,000. It was somewhere in between. It's in that range. But Mr. Stewart, on what basis did Judge Zappa apply this 55% discount? What basis in the record is there for that? In the record, the court asked during the pendency of the trial, opposing counsel, Counsel, how am I going to determine the value of 50% interest in this whole shoot and match? How am I going to make that determination? You presented no evidence, no documentation, no experts.  which there was an opportunity for a reply brief and response outlined that other cases in Illinois that I've cited to the court, NAB case, which was a mortgage foreclosure and approval of a sale of a one-half interest. That was a $280,000 market value that sold for undivided one-half interest for $20,000. There were no experts before the court or referred to in the court opinion, and the statement is that it's approved, and there was specific reference to the discounts taken in tax court cases and others. In other words, fractional interest and lack of marketability. I don't think that the experts themselves had to render a decision saying that there was a minority interest or a lack of control or marketability. Are you saying in your brief to the trial court, your trial brief or whatever brief it was, you argued for a discounted value and cited cases to that effect? Yes. So it wasn't like Zappa pulled this out of his hat on his own? No. An opposing counsel had an opportunity to file a reply brief responding to those cases. So you don't think you need expert testimony to come up with a percentage of a discount? Look at the various cases. If you examine fractional interest and lack of marketability cases, you'll see that the door sometimes is open because of reliance on expert witnesses. But the courts vary dramatically from what each of the experts, and normally it's a tax court case, each of those experts renders. Some of them, IRS doesn't even have one. They're responding and don't even provide an expert. But the court has the ability to vary dramatically from what those experts come in. And the testimony before the trial court, before Judge Zappa, clearly outlined all the issues of marketability. You had four children who were beneficiaries. Now two of them say that we're bound by the quit claim deed. We're going to honor that. And they have not become parties to this complaint. But you have two opposing factions that aren't ever going to get along. That was pretty clear. The acrimony in the courtroom was clear to Judge Zappa. But then you have an unbelievable tract of ground that's surrounded by railroad tracks, an interstate or a major highway, a river, and a commercial operation. It's landlocked. And then the appraisers themselves said, well, we assumed that there was an easement across the brothers' commercial property. There's no verification. There's a claim by the brother that that was a personal easement. Those appraisers' qualifications and their documents themselves were impeached by their testimony saying, well, we assumed it was a public access across there. Well, there is a public access down along the river, which floods 40 percent of the year and makes it inaccessible through that easement, right? So those are major issues that the court was aware of and used to determine that there should be a fractional interest discount and a lack of marketability. Both the appraisers said all the improvements that were made and very attached $60,000 of value on it, you're not going to be able to use those to sell this property. People are not going to be interested in running the same types of operation. Those buildings ought to be torn down. Both of them said that. The highest and best use is recreational use. Tear the buildings down. That's the way the property started. No buildings on it. Recreational use. And Ed is the one who put those enhancements on. So number one, I think the residence itself ought to be covered by the enhanced value and the improvements, the other improvements. Getting into a couple of other issues, I've outlined what the court was presented with through all the testimonies. From 2006 all the way through 2012, the defendant went through and marked as to the type of operation that was involved on the property. Clearly there were three operations that were only on the trust property. You had the boarding stable, the rentals, the mobile home rentals, and the feed and grain. Then you have the hay rack ride. The hay rack ride is, to me it was sort of a red herring. It all centered and we spent half the time in the trial court discussing a hay rack ride on a 47-acre tract that was not part of the trust property. At least three-quarters or more of the operation was up on that 47-acre tract and at most 20% went through the trust property. Some years it didn't go through there at all. They went out and they hired a private investigator to rough out how many tickets at $10 a ticket. They estimated 3,200 went through in one year. It's a Halloween hay rack ride and it's only three weekends a year. So it's a limited number that you're going to have. Well, at 3,200 attendees at $10 a pop you would figure, and he was not there the entire time, that's $32,000. Well, the deposit statements or tickets from the defendant show $40,000 coming off of the hay rack ride in 2012, I think it is. There wasn't any fraud there. Yes, he deals in cash. There are other businesses that deal in cash, laundromats. The mere fact that he deals in cash does not mean that he is intending to defraud anyone. I don't think that can be said at all. And there's no testimony other than one of the plaintiffs saying that this is a scheme to defraud family, government, and others. He's never been charged. He's never been subject to any review by any state or federal agency in regard to his operations. So we went through from 2006 all the way to 2012 and labeled each of the operations that occurred on the trust property. And then we had another category of other. He had a cattle operation that he dealt with on the 47-acre tract, and he sold cattle. He sold over $42,000 worth of cattle. Opposing counsel would lump that all in and say that's part of the trust too because you can't prove it one way or the other. Well, they alleged and the plaintiff got up and said, well, they run the cattle on the trust property. They have it during the winter months for shelter. Well, that neglects the fact that the defendant built a shed across the road on the 47-acre tract that provides shelter and housing for his cattle during bad weather. So that operation and that argument really doesn't hold water in my mind. So day by day, the items of receipt and disbursement are carried through on the secretary's register. And that was from 2006 to 2012. The accountant got on the stand and said, okay, in light of the lack of documentation, the only way that I can figure out reasonably to present this to the court is what the defendant did. Go through the secretary register and go through the deposit tickets, label each and every one of them. And when he examined the listing that we had prepared and submitted, sort of totaling these or the summaries, he said, okay, I looked at 2011 in particular. I spent a great deal of time and reviewed that. It appears correct. Then I did a cursory review of 2006 or I think it was 2008. I can't remember. I think he started representing and doing the accounting work in 2008. 2008 through 2012, and he said that appears accurate. It appears that it would be substantially the same if I had done that as you had done that. One of the questions came, okay, what transpired with the accountant is every year the accountant would take the books and records. The secretary's register, the deposit ticket, the bank statements, and the bank statements anymore have copies of the checks, so he could cross-check what's going on. And every year I would set up a general register. They tried to double-check or match up between the income tax return and the general register. And after examination at his office, the accountant came back and said, I can tell you, Judge, that this is identical figures. Those match up perfectly. There's nothing wrong. There's nothing missing. Those do match up. I've got very little time left. If the court has questions for me. I don't think so. Just getting back, I think there was sufficient data. The kitchen sink was basically put into the record. All the boarding leases, the mobile home leases, all of that was before the court. All of the income tax returns from 86 all the way through. Opposing counsel would impose income in a three-year period where Ed Carter was basically unable to work on the trust property and served as a night watchman for his brother and got a W-2. That was coterminous with his divorce proceeding for whatever reason. But he didn't work on the trust property. And yet they would impose and say, well, he's earned income. That's going to be part of the trust. As far as the loss or the use of the S&P 500, once again, we get back. I see no cases cited in support of that. There was obviously no expert testimony on that whatsoever. So we feel that the trial court order should stand. Thank you. Thank you. We'll follow Mr. Smith. Just briefly, the trial court order, I don't believe in anything about the enhancement. It just simply took a discounted value based upon what the appraisals were. I don't recall the court asking me how do I split this up between two people. I know my answer would have been 50-50. Mr. Smith, I didn't see a case. You know, you raised the argument about the discount. Did you find any cases that said the court can't apply a discount without expert testimony? No, but I haven't found any case that says when someone puts it in an order and I didn't get a chance to respond at the trial level. I did respond. Mr. Stewart said he laid it out in his brief. He laid it out in his brief to the court, and I objected to that in my response, saying there was no testimony with regard to this. He had an expert that could have laid that out. We had an expert. He could have asked him that. And he mentions with the experts that they had all these facts about river, highway, everything else. Both appraisers had that. Mr. Kinsler, who did an appraisal, did not know that there was businesses operated on that property and that he didn't take into account income when he took the value. So you did respond to Mr. Stewart's brief? I did respond. On this issue? On that issue. This was after the trial, like in a bench memo afterwards? We had a memo afterwards, and I raised the issue of the fact that we never had any testimony with regard to that, and the court should discount that. And what other argument can I make with regard to that? I had two experts, and neither one of them was asked that question. He says that Sainer matched up the secretary, and then it came in his records. Well, his records were the secretary. He took the secretary, and then he created this general ledger, and I would be flabbergasted if that accountant didn't match up. He's got records A, and he's supposed to transpose into an accountant-type form general ledger. It should be absolutely identical. But Sainer did testify. He didn't see any records. He didn't see any documents at all. And I don't recall that there were any great number of checks presented by Mr. Carter with regard to expenses he had in the case. And I would just ask the court to remand it back, or if you can come up with a reasonable solution. But certainly, at the very least, the real estate should be taken as it was appraised and divided equally. I see no reason at this point in time to discount it. And also keep in mind that the trust document itself said that if the trustee does anything in that, it's asked to adhere to the benefit of the trust, not to the trustee. Thank you. Thank you, counsel. We'll take this matter under advisement and stand at recess until the writing is in the next case. Excuse me, sir, if I could say one thing.